## PHELPS *v.* AUDITOR GENERAL.

1. ASYLUM BOARDS—EMPLOYMENT OF COUNSEL—DRAFTING LAWS.
   The duty to prepare proposed legislation is by the Constitution imposed upon the legislature; and the board of trustees of the Michigan Asylum for the Insane has no authority to obligate the State to pay for services of counsel in drafting a proposed revision of the asylum laws of the State.

2. SAME—UNLAWFUL EXPENDITURES — AUTHORITY OF AUDITOR GENERAL.
   Under 1 Comp. Laws, § 1207, providing that the auditor general shall audit all vouchers for expenditures made on account of a State institution, so far as the same shall appear to be for lawful purposes, he cannot be compelled to audit an expendi-

ture by the authorities of an asylum for an unlawful purpose, though made in good faith.

3. SAME—MAINTENANCE BILLS—CONSTRUCTION OF STATUTE.

Under Act No. 148, Pub. Acts 1899, prohibiting the auditor general from drawing his warrant for the benefit of a State institution until vouchers for disbursements of money previously drawn shall have been audited as provided by law, he cannot be compelled to pay the maintenance bills of an asylum until an unlawful expenditure, which he had previously refused to audit, has been repaid into the treasury.

*Mandamus* by Edwin J. Phelps, as treasurer of the Michigan Asylum for the Insane, to compel Perry F. Powers, auditor general, to draw his warrant for the payment of certain bills. Submitted February 26, 1904. (Docket No. 210.) Writ denied April 26, 1904.

*Knappen, Kleinhans & Knappen,* for relator.

*Charles A. Blair,* Attorney General, and *Henry E. Chase,* Deputy Attorney General (*Charles W. McGill,* of counsel), for respondent.

CARPENTER, J. January 30, 1903, the board of trustees of the Michigan Asylum for the Insane paid from its treasury to attorneys employed by it the sum of $199.39 for services in drafting a revision of the asylum laws of the State. April 25, 1903, the auditor general refused to audit the voucher for said payment, and directed the asylum authorities to cover the amount thereof into the asylum treasury. This direction was not complied with. Early in October the asylum authorities presented in due form their bills for the maintenance of patients and inmates for the quarter ending September 30, 1903. Respondent refused to honor and provide for the payment of said bills on the ground of said alleged improper payment to counsel, and the refusal of the authorities to repay the amount thereof into the treasury. Relator thereupon brings these proceedings for a *mandamus* directing said respondent to honor and provide for the payment of said

maintenance bills for the quarter ending September 30, 1903.

As stated in the brief of relator, there are involved in this case three questions:

"1. The power of the asylum board to employ counsel for the purposes stated.

"2. The right of the auditor general to reaudit bills actually incurred by the asylum board of trustees for asylum purposes, and audited and allowed by that board, and paid by the asylum trustees on such authority.

"3. The right of the auditor general to hold up the maintenance bills of the asylum for the purpose of compelling reimbursement on account of payments made under the circumstances above stated."

We will discuss each of these questions separately:

1. Had the asylum authorities authority to obligate the State to pay for services of counsel in drafting proposed legislation? This question was involved in *Cahill* v. *Board of State Auditors*, 127 Mich. 487 (86 N. W. 950, 55 L. R. A. 493), where it was decided that the governor of the State lacked such authority. That decision did not, as contended by relator's counsel, rest "upon the proposition that the governor's duties, under the Constitution, are plainly executive merely,—to 'take care that the laws be faithfully executed.'" That decision is authority for the proposition that the duty to prepare proposed legislation is, in contemplation of the Constitution, vested in the members of the legislature, and that no official has authority to obligate the State to pay for the performance of such duty without statutory authority, and that the governor did not possess such authority by reason of his constitutional obligation (see section 8, art. 5) to "give to the legislature * * * information by message of the condition of the State, and recommend such measures to them as he shall deem expedient." Under this construction, that decision rules the present case, and compels the conclusion that the asylum authorities had no power to obligate the State for the expenditure under consideration.

2. Had respondent the right to refuse to audit the voucher for the expenditure in question? Many authorities are cited which hold that the board of asylum trustees acted in a *quasi* judicial capacity in incurring and paying the obligation in question, and that for that reason their action should be sustained. If respondent's right to review this expenditure depended upon common-law principles, these authorities might apply. But the right in question does not depend upon the principles of the common law, but upon the construction of a statute. The statute governing the matter is section 3 of Act No. 148 of the Public Acts of 1873 (section 1207, 1 Comp. Laws), which reads:

"Such account current, abstract, vouchers, and receipts, when received by the auditor general, shall be examined by him, and, if found correct, shall be so indorsed by him; and all vouchers for expenditures, so far as the amount thereof shall appear to be for lawful purposes, he shall audit."

It is contended by relator that, under the proper construction of this language, respondent has a right to refuse to audit an expenditure—that is, "to review the exercise of authority by the asylum trustees—only when it is shown that such authority has been exercised in actual bad faith, or when it is so plainly beyond authority as to raise a clear and inevitable presumption of bad faith." If this construction is correct, respondent had no right to refuse to audit the expenditure, and relator is entitled to a *mandamus*, for it is clear not only that the board of trustees acted in good faith, but that the services in question were well worth the sum paid, and were efficiently performed. We cannot, however, assent to that construction. Respondent is to audit the expenditure when it "shall appear to be for lawful purposes," and this necessarily implies that he shall not audit an expenditure which shall appear to be for an unlawful purpose. Manifestly, he is to judge of the lawfulness of the purpose, not by an outside inquiry into the motives of those who authorized

the expenditure, but by the expenditure itself. According to relator's contention, respondent's statutory obligation to audit expenditures which "appear to be for lawful purposes" requires him to audit some expenditures which appear to be for an unlawful purpose; that is, expenditures made in good faith for an unlawful purpose. We do not think the language of the section susceptible of this construction. We do not think it can be construed as requiring respondent to audit *any* expenditure, no matter with what motives it may have been made, which does not "appear to be for lawful purposes."

3. Had the auditor general power to decline to pay the maintenance bills of the asylum for the quarter ending September 30, 1903, because of this unlawful disbursement made by the asylum authorities in the preceding quarter? This depends upon the proper construction of section 1209, 1 Comp. Laws, as amended by Act No. 148 of the Public Acts of 1899. The material portion of that section, as amended, is:

"And the auditor general is hereby prohibited from drawing his warrant until itemized vouchers, showing quantities, prices per unit, and totals for all material, labor, or services covered by the disbursements of money previously drawn, for either current expenses or building and special purposes, whether the money thus disbursed be received from the State treasury or from some other source or sources, shall be presented, examined, and audited, as provided in section 3 of this act" (section 1207, heretofore quoted).

This language seems to us clear and unambiguous, and susceptible of but one construction. Until itemized vouchers, covering disbursements of money previously drawn, shall be presented, examined, and audited, as provided in section 1207, the auditor general is prohibited from drawing his warrant. When the auditor general, acting legally, as in this case, refused to audit vouchers for prior disbursements, he is prohibited by this section from drawing the warrant next applied for, and therefore he could not comply with relator's request.

It is urged with much force that this construction prevents the asylum getting a fund necessary for its maintenance, because of a prior unlawful expenditure, and therefore may cause great hardship. This is an argument which might with much force be addressed to the legislature, but it is clearly insufficient to justify us in annulling the legislative will, so clearly expressed.

It results from these views that the *mandamus* prayed for will be denied; but it is not a case in which costs should be awarded.

The other Justices concurred.